UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF KENTUCKY
PADUCAH DIVISION
CIVIL ACTION NO. 5:11-CV-00189-TBR

WEHR CONSTRUCTORS, INC.                                                           Plaintiff

v.

ASSURANCE COMPANY OF AMERICA                                             Defendant

**MEMORANDUM OPINION AND ORDER**

This matter is before the Court upon Defendant Assurance Company of America's ("Assurance") Motion for Summary Judgment. (Docket No. 29.) Plaintiff Wehr Constructors, Inc. ("Wehr") has responded. (Docket No. 35.) Defendant Assurance has replied. (Docket No. 40.) Plaintiff Wehr has filed a surreply. (Docket No. 42.) Defendant Assurance has filed a response to this surreply. (Docket No. 46.) This matter is now fully briefed and ripe for adjudication. For the following reasons and consistent with the below opinion, the Court will **GRANT in part** and **DENY in part** Defendant Assurance's Motion for Summary Judgment.

The Court **ORDERS** the telephone conference on December 20th cancelled. A telephone conference is set for **December 9th at 10:30 AM central time**. Pretrial filing deadlines are vacated at this time and will be set by the Court at the conference. The Court will place the call.

BACKGROUND

Overview

This action involves a suit by Plaintiff Wehr against Defendant Assurance seeking a declaration that Assurance—as an insurer—owes a duty under a Builder's Risk and Installation Insurance Policy to pay all of Murray-Calloway County Hospital's ("MCCH") losses arising out of the damage to the hospital floors. Wehr has standing to assert MCCH's claims by virtue of an assignment by MCCH to Wehr.[1] As will be discussed in more detail below, Wehr received this assignment as a result of a settlement between Wehr and MCCH of claims asserted against each other. A background of the events predating this current suit by Wehr against Assurance is necessary for understanding the issues involved in this case.

Background of Events Predating Current Suit

On November 13, 2007, Wehr entered into a construction contract with MCCH to essentially be the general contractor for the expansion of MCCH. Under the contract, Wehr was responsible for installing floor surfaces and concrete subsurfaces in different floors and rooms of the expansion. The floors were installed from February to October

---

[1] The Kentucky Supreme Court previously granted a certification request to answer the following question of Kentucky law involved in this case:
> Whether an anti-assignment clause in an insurance policy that requires an insured to obtain the insurer's written consent before assigning a claim under the policy is enforceable or applicable when the claimed loss occurs before the assignment, or whether such a clause would, under those circumstances, be void as against public policy.

(Docket No. 20.) The Kentucky Supreme Court concluded that such a clause is *not enforceable or applicable* to the assignment of a claim under the policy when the covered loss occurs *before* the assignment, and that such a clause would, under those circumstances, be void as against public policy. (Docket No. 20.) Accordingly, this Court denied Assurance's motion for judgment on the pleadings because the policy's anti-assignment provision was unenforceable, thereby rendering MCCH's assignment valid.

of 2009. It was later discovered that certain portions of these floors were damaged through bubbling, pop-outs, and/or dimpling.[2] It was subsequently determined that this damage was due to the presence of shale/low grade coal particles at or near the surface of the installed light-weight concrete floor slabs. When exposed to high moisture levels these particles were prone to swelling, thereby causing surface dimples or bumps beneath the floor covering.[3]

Subsequently, a dispute arose between Wehr and MCCH about the money that was due and owing under the contract, resulting in Wehr initiating suit against MCCH. When MCCH filed its Answer, it also filed a counterclaim alleging that Wehr had performed work in a negligent manner and in a way that breached its contract with MCCH. Ultimately, the claim between MCCH and Wehr was settled. As part of the settlement agreement, MCCH assigned to Wehr any claims MCCH had against Assurance under a Builder's Risk and Installation Policy obtained by MCCH through Assurance. MCCH obtained this Builder's Risk Insurance Policy to insure against property damage risks associated with the expansion.[4] (Docket No. 29-5.) The Builder's Risk Policy was in effect from December 1, 2007, to October 1, 2009. (Docket No. 40, Page 6.)

---

[2] As will be discussed below, Wehr and Assurance disagree as to when exactly the "damage or loss" to the floors was "discovered."

[3] "This condition was exacerbated by the failure to identify the presence of these particles and properly address higher than manufacturer's recommended moisture levels in the concrete at the time of floor covering placement." (Docket No. 35-14, Page 7.)

[4] A Builder's Risk policy is a form of property insurance that covers the interests of owners and others involved in a construction projection. The policy insures against the risk of property damage to the project. (Docket No. 35, Page 2.)

The exact date MCCH "discovered" the "loss or damage" is significant in determining whether Wehr's claims against Assurance are barred by a provision in the policy containing a statute of limitations for asserting legal claims. That provision requires that legal action against Assurance under the insurance contract must be brought "within 2 years after you first have knowledge of the direct loss or damage." (Docket No. 29-5, Page 13.) The Complaint by Plaintiff Wehr against Defendant Assurance was filed on November 23, 2011. (Docket No. 1.) The parties disagree when exactly MCCH discovered the damage or loss.

Plaintiff asserts that the "damage, and MCCH's discovery of the damage, occurred on different dates depending on where the floors were located." (Docket No. 35, Page 1.) Plaintiff concedes MCCH discovered the manifestation of damage to the floors in patient rooms and hallways—mostly on Floors 2 and 3—in October and November of 2009. *Id.* at 1-2. However, Plaintiff contends damage to the floors in the operating rooms—located on Floor 4—manifested itself many months later in approximately July 2010. *Id.* at 2. Accordingly, Plaintiff argues that damage is separate and not barred by the statute of limitations provision.

Defendant disagrees with Plaintiff's assertions and argues that the date of "damage or loss" to the operating room floors should be set at an earlier date than the manifestation of damage because Plaintiff had knowledge that the concrete mix was likely expanding and had previously caused problems on other floors. Alternatively, if the Court would accept Plaintiff's initial contention that the date of the damage or loss

be when the actual manifestation of damage occurred (July 2010), then Defendant argues that the damage is not recoverable because it is outside the policy coverage.

STANDARD

Summary judgment is appropriate where "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). In determining whether summary judgment is appropriate, a court must resolve all ambiguities and draw all reasonable inferences against the moving party. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

"[N]ot every issue of fact or conflicting inference presents a genuine issue of material fact." *Street v. J. C. Bradford & Co.*, 886 F.2d 1472, 1477 (6th Cir. 1989). The test is whether the party bearing the burden of proof has presented a jury question as to each element in the case. *Hartsel v. Keys*, 87 F.3d 795, 799 (6th Cir. 1996). The plaintiff must present more than a mere scintilla of evidence in support of his position; the plaintiff must present evidence on which the trier of fact could reasonably find for the plaintiff. *See id.* (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986)). The plaintiff may accomplish this by "citing to particular parts of materials in the record" or by "showing that the materials cited do not establish the absence . . . of a genuine dispute . . . ." Fed. R. Civ. P. 56(c)(1). Mere speculation will not suffice to defeat a motion for summary judgment; "the mere existence of a colorable factual dispute will not defeat a properly supported motion for summary judgment. A genuine dispute between the parties on an issue of material fact must exist to render summary

judgment inappropriate." *Moinette v. Elec. Data Sys. Corp.*, 90 F.3d 1173, 1177 (6th Cir. 1996).

DISCUSSION

Kentucky Courts have consistently applied the rule that an insurance policy may contractually set a shorter limitations period than is provided by statute, *see Webb v. Kentucky Farm Bureau Ins. Co.*, 577 S.W.2d 17 (Ky. Ct. App. 1978), absent a statue or regulatory scheme that such a shorter limitations period would conflict with or a finding it would be unreasonable. *See Elkins v. Kentucky Farm Bureau Mut. Ins. Co.*, 844 S.W.2d 423, 424 (Ky. Ct. App. 1992) (finding one-year time limit was impermissible because it conflicted with two-year limitation allowed by Motor Vehicle Reparations Act); *Pike v. Gov't Employees Ins. Co.*, 174 F. App'x 311, 315 (6th Cir. 2006). *Webb* found that a homeowner's insurance policy provision requiring commencement of suit within 12 months after inception of loss was not in conflict with any statutes—including a statute designating a 15-year statute of limitations for action on a contract—and implicitly found such a limitation was reasonable. *Webb*, 577 S.W.2d at 19 (finding appellant's action to recover for fire loss under homeowner's policy was barred because action was not brought within 12 months of the inception of the loss). Notably, *Webb* found the public policy of Kentucky favors such limitations. *Id.* at 18.

In *Smith*, the Sixth Circuit held that a one year limitations period "after the inception of loss or damage" in an insurance contract did not conflict with Kentucky law and was reasonable. *Smith v. Allstate Ins. Co.*, 403 F.3d 401, 402-04 (6th Cir. 2005). The *Smith* Court still gave effect to the one-year limitations period, even though

the contract prohibited suit during a portion of that year. *Smith*, 403 F.3d at 405; *see also Edmonson v. Pennsylvania Nat. Mut. Cas. Ins. Co.*, 781 S.W.2d 753, 756 (Ky. 1989). Smith held provisions "limiting the time within which an insured may sue are generally valid under Kentucky law." *Id.* at 404 (citations omitted).[5]

Plaintiff demonstrates that there is precedent establishing these suit limitation provisions are strictly construed against the insurer. Plaintiff also demonstrates that the doctrine of "reasonable expectations" requires the insured be entitled to all coverage he may reasonably expect to be provided under the policy is applicable in Kentucky. *See Bidwell v. Shelter Mutual Insurance Company*, 367 S.W.3d 585, 589 (Ky. 2012). The "suit limitation" provision in the policy between Assurance and MCCH is as follows:

> **C. Legal Action Against Us**
> No one may bring a legal action against us under the Coverage Part unless:
> 1. There has been full compliance with all the terms of this Coverage Part; and
> 2. The action is brought within 2 years **after you first have knowledge of the direct loss or damage**.

(Docket No. 29-5, Page 2) (emphasis added.) Plaintiff argues under the doctrine of reasonable expectations and the general rule that suit limitation provisions are strictly construed against the insurer, each portion of the damage for which coverage is sought should be considered separately.

Defendant argues it is entitled to summary judgment because Plaintiff Wehr's claims are barred by this provision because MCCH had knowledge of the "direct loss or

---

[5] While Plaintiff did not appear to seriously argue to the contrary, the Court holds that the suit limitation provision in the Assurance policy of two years would not be in conflict with any statute or regulatory scheme in Kentucky and would be reasonable.

damage" more than two years before the filing of the Complaint.[6] On the other hand, Plaintiff asserts there are two grounds upon which the Court should deny Defendant's motion for summary judgment. First, Plaintiff contends there is a genuine dispute of material fact as to whether MCCH first had knowledge of at least some of the "direct loss or damage" less than two years before suit was filed against Defendant on November 23, 2011. Second, Plaintiff asserts that pursuant to KRS § 304.14-370 the Assurance suit limitation period was tolled from the time MCCH first notified Assurance of its loss claim until the date Assurance denied such claim.[7]

I. <u>Contention of Genuine Dispute of Material Fact as to Whether MCCH First Had Knowledge of Some Direct Loss or Damage Before November 23, 2009</u>

Plaintiff concedes that MCCH first learned of damages to vinyl floors in the patient rooms and hallways—mostly on the Floors 2 and 3—on October 21, 2009. (Docket No. 35, Plaintiff's Response Brief, Page 11-12.) Therefore, claims for such damages would have been brought more than two years after knowledge of the "direct loss or knowledge" based on the November 23, 2011, filing of the Complaint. Accordingly, the suit limitation provision bars these claims and the Court will **GRANT** summary judgment to Defendant as to the claims arising from damage to vinyl floors in the patient rooms and hallways.[8]

---

[6] Plaintiff filed the Complaint in this case on November 23, 2011, (Docket No. 1), meaning the suit limitation provision would bar any claims Wehr had knowledge of before November 23, 2009.
[7] On January 7, 2011, MCCH sent written demand that Assurance cover MCCH's losses arising from the damage to the operating room floors. On January 10, 2011, MCCH sent written demand that Assurance cover MCCH's losses arising from the damage to all of the floors. On June 1, 2011, Assurance sent a letter to MCCH stating it had retained an engineer to inspect the project and determine the cause of damage, but would conduct the investigation under reservation of rights. On August 2, 2011, Assurance sent a letter to MCCH stating that it had determined there was no coverage for MCCH's floor damage claim. (Docket No. 35, Page 2-3.)
[8] The Court notes that Plaintiff appears to argue that "the initial damage to the hallways and patient rooms worsened after October 2009 and was first discovered after November 23, 2009" which "presents a question

However, Plaintiff asserts that damage to the operating room floors—located on Floor 4—was not discovered on October 21, 2009.[9] *Id.* at 12. Plaintiff contends this "significantly different damage" to the operating room flooring was discovered by MCCH in July 2010.[10] (Docket No. 35, Page 13.) Plaintiff points to several records of communication and other testimony to support this assertion. These records/evidence include the Declarations of Shawn Woosley the Chief Financial Officer of Wehr, an email by an employee of MCCH—Sandra McKinney—initially reporting damage to the floors in operating rooms one and four (and "possibly others"), and the Declaration of William C. Adams who is the outside general counsel for MCCH. (Docket No. 35-1, ¶ 13) (Docket No. 35-4) (Docket No. 35-2., ¶ 7, 11.) Plaintiff also points out an August 20, 2010 email from Mark Torsak—MCCH Safety Coordinator—reporting damage to the floor in operating room four and a September 1, 2010 letter from Joseph Jones to Wehr reporting a problem with the flooring in operating room four.[11] (Docket No. 35-5; 35-7.)

Defendant argues that, notwithstanding the above evidence, MCCH had knowledge of the damage to the operating room floors more than two years before the

---

of fact." (Docket No. 35, Page 18.) The Court does not see how the allegation that the damage "worsened" would change the outcome. Plaintiff concedes MCCH knew of this damage more than two years before the claim was filed and the fact that the damage "worsened" would not reset the limitations period since Plaintiff admittedly already had knowledge of the damage.

[9] The Court notes Plaintiff has been inconsistent as to what floor the operating rooms are located. In most of Plaintiff's briefing, it is alleged the operating room floors are located on floor four. However, in Plaintiff's timeline at Docket No. 40-2, it is alleged the operating rooms are located on floor two. While this does not impact the Court's holdings, the Court will assume floor four is the correct floor.

[10] Plaintiff alleges the theory that the damage to the operating room floors was "different" from the damage to the patient rooms and hallways—which is barred by the suit limitation provision—is supported by the fact that MCCH sent two separate claim notices to Assurance. Both a general claim notice dated January 10, 2011, and a prior claim notice dated January 7, 2011, specifically limited to the operating room floor damage, was sent.

[11] Plaintiff also references an August 20, 2010 email from Joe Jones to MCCH representative Russell Clendenin concerning floor issues in the operating rooms. (Docket No. 35-6.)

filing of this Complaint on November 23, 2011.[12] Defendant argues an email from Wehr to Pinnacle, Inc. and Federal Concrete on November 2, 2009, establishes that MCCH had knowledge of the damage or loss more than two years before November 23, 2011:[13]

> This letter will **constitute notice of a serious defect in the concrete flooring at the Murray Calloway County Hospital.** This letter should also be considered sent on behalf of MCCH by Wehr in Wehr's capacity as construction manager for the project.
>
> After the stripping and waxing of the **vinyl composition floor tile** on the second, third, fourth, and fifth floors, which took place on or about October 21, 2009, Wehr's onsite personnel **notice a bubbling effect on several tiles in numerous areas on all four floors.**
>
> This bubbling is not occurring on the first floor, which **leads Wehr to believe this could be an issue with the lightweight concrete mixed placed on the metal decking on floors two through five.** Several sections of the vinyl flooring have been removed in rooms on the third floor because of the extreme situation which occurred there.

(Docket No. 29-6) (emphasis added.) Furthermore, Defendant argue the Concrete Core Analysis report prepared by Mineralogy, Inc. submitted on November 5, 2009, identifying issues with the floor shows that there was knowledge of issues with the flooring prior to November 23, 2009.[14] A relevant portion of this report states:[15]

---

[12] Defendant argues an expert report, (Docket No. 35-14, Page 7), supports the damage or loss taking place upon the sealing of the floor because it states the damage was "exacerbated" by the "floor covering placement." However, the report makes clear the presence of the shale/low grade coal particles near the surface of the light-weight concrete floor slabs also caused the damage. In any event, even assuming the loss or damage was partially attributable to placement of the floor covering, there is a genuine dispute as to whether Plaintiff had the requisite knowledge of the "loss or damage" prior to the manifestation of the damage to the floor.
[13] Defendant argues this email should be considered sent on behalf of MCCH by Wehr in Wehr's capacity as construction manager for the project. Plaintiff does not dispute this characterization.
[14] Plaintiff became aware of pop-outs and cracks in the vinyl flooring on all four floors no later than October 21, 2009. Core samples were taken and sent to Mineralogy on October 29, 2009. On November 5, 2009, Mineralogy submitted a report that concluded the problem was caused by expanding shale in the concrete.

> The pop-out failures detected in the concrete slab core samples from the Murray-Calloway Co. Hospital in Murray, KY **are directly related to the subtle volumetric expansion of lightweight aggregate particles incorporated in the mix design**. Expanded shale particles situated very near the surface of the slab in the concrete cross sections have been subjected to increasing fluid saturation (associated with the development of condensate layers beneath the impermeable floor coating materials), resulting in the swelling of these particles & the ultimate rupture of the concrete immediately overlying the effected particles.

(Docket No. 29-7, Page 7) (emphasis added.)

It is clear from this evidence that MCCH had knowledge there was a future *possibility* of "direct loss or damage" to the operating room floors before November 23, 2009.[16] However, knowledge of a *possibility* of direct loss or damage is distinct from the knowledge of an actual direct loss or damage required under the policy provision. The damage to flooring, other than in the operating rooms, barred under the suit limitation provision all manifested itself by October 21, 2009. Plaintiff contends that the damage to the operating floor rooms did not manifest itself until July 2010. (Docket No. 35, Page 13.) Furthermore, it appears the operating room floors had a lead sheet floor covering—as opposed to a vinyl floor covering in other areas—which Plaintiff argues caused the damage manifestation to be delayed.

---

[15] Plaintiff states this report "did not address the Operating Room floors since, with no damage to them being apparent at that time, no concrete samples had been taken from the Operating Rooms." (Docket No. 35, Page 12.) However, it appears the same concrete mix from which these samples were taken would have used in the operating rooms.

[16] The Court recognizes that MCCH's counsel on November 24, 2009, communicated to Wehr awareness that "all problems with the floor may not be visible for some time." (Docket No. 40-4.) The Court notes that this letter is dated November 24, 2009—one day past November 23, 2009—and in any event only reinforces that MCCH had knowledge of a future *possibility* of direct loss or damage to the operating room floors.

Subsequent reports revealed that the problems with the operating room flooring was—like the other flooring—caused by "the expansion of coal particles in the near surface region of the concrete." (Docket No. 37-1, Page 5.) The Court recognizes that these subsequent reports were produced after November 23, 2009. It merely notes these reports to show that all the flooring problems resulted from the same expansion of the coal from the concrete mixes.

In any event, even putting aside the lead sheet floor covering, there is a genuine dispute of material fact as to whether MCCH had "knowledge of the direct loss or damage" to the operating floors more than two years before the filing of the Complaint on November 23, 2011. Accordingly, the Court will **DENY** summary judgment to Defendant as to the claims concerning the operating room floors.[17] The Court notes this is a close call and the Court will examine this issue at the close of the evidence.

    a. <u>Defendant's Alternative Argument That the Alleged Loss or Damage Did Not Occur During the Coverage Period</u>

Even assuming the damage to the operating room floors is not barred by the suit limitation provision, Defendant argues the loss or damage did not occur during the coverage period. The Builder's Risk Policy was in effect from December 1, 2007 to October 1, 2009. Defendant alleges the operating room floors were not even completed until October 9, 2009, which was eight days after the coverage period ended. Even accepting Plaintiff's assertions, Defendant points out the alleged damage or loss did not occur until on or around July 2010—almost a year outside the coverage period. (Docket No. 40, Page 8-9.)

Plaintiff argues Assurance misinterprets its policy and the facts. The relevant provisions of the Builder's Risk policy state:

> **C. Legal Action Against Us**
> No one may bring a legal action against us under the Coverage Part unless:

---

[17] It also appears that Plaintiff alleges subsequent to the discovery of damage to the operating room floors, "new additional damage in other locations" was discovered. (Docket No. 35, Page 15.) This damage is alleged to involve "other locations, including the hallway adjacent to the Operating Rooms" and not "just over the lead." (Docket No. 35-8.) To the extent damage was discovered subsequent to the manifestation of damage to the operating room flooring and was not "worsening" of damage previously discovered, the Court will deny summary judgment to Defendant on those claims as well.

    1. There has been full compliance with all the terms of this Coverage Part; and
    2. The action is brought within 2 years after you first have *knowledge* of the direct loss or damage.

\* \* \*

**E. Policy Period, Coverage Territory**
We cover loss or damage *commencing*:
    1. *During the policy period* shown in the Declarations;[18] and
    2. Within the coverage territory.

(Docket No. 29-5, Page 13) (emphasis added.) Plaintiff's summary of Conditions C and E is that for there to be coverage the loss or damage must **commence** during the policy period from December 1, 2008, to October 1, 2009, and the action must be brought within two years after knowledge of the direct loss of damage. Plaintiff contends that the loss/damage to the operating room floors had already "commenced" before October 1, 2009—it just hadn't yet been discovered—and therefore MCCH's losses from that undiscovered damage would be covered. Essentially, Plaintiff argues that just because the damage to the operating room floors had not become fully manifested, visible, or discoverable yet did not mean it had not "commenced" by October 1, 2009.

    Although not binding because it is a case from the Supreme Court of North Dakota, *Kief Farmers Cooperative Elevator Company v. Farmland Mutual Ins. Co.*, 534 N.W. 2d 28 (N.D. 1995), is instructive because of the similar language in the insurance contract and it involved a situation where damage allegedly commenced at an earlier time, but did not manifest itself until a later date. *Kief* involved a contractor incorrectly installing the "wall side discharge flume hoods" of a 100,000 bushel grain storage facility bin. *Id.* at 30. This wall side discharge flume system was used only once

---

[18] The original policy period of December 1, 2009, to August 1, 2009, was extended to October 1, 2009 by a Renewal Endorsement, dated July 10, 2009. (Docket No. 1-1, Page 26.)

approximately three years later, resulting in immediate damage to the upper half of the wall and roof of the bin.[19] *Id.* The actual damage was not actually discovered until approximately five years later. *Id.* The *Kief* Court held that the damage commenced at the time of the incorrect installation. *Id.* at 36 (deciding that trial court incorrectly held the loss or damage did not commence within the meaning of the policy until its manifestation or discovery). The Court finds the same analysis applies here with equal force and finds it would be improper to determine a "damage or loss" had not occurred simply because the damage had not manifested itself.[20]

In *Libbey-Owens-Ford Co. v. Ins. Co. of North America*, 9 F.3d 422 (6th Cir. 1993), the insured filed a claim under an insurance policy to cover damages caused by a furnace shut down, claiming coverage for the cost of rebuilding the furnace for business interruption. *Id.* at 424. There was testimony in November of 1986 employees discovered the breast wall of a furnace was leaning and partially detached, a dangerous condition. *Id.* The jury determined that the furnace sustained "direct physical loss or damage" during the policy period of June 1, 1986, to June 1, 1987. *Id.* at 425. The Sixth Circuit upheld the jury's verdict. *Id.* at 430.

---

[19] The Court finds Defendant's attempt to distinguish *Kief* because in that case it was known exactly when the damage commenced unavailing. While here it appears Plaintiff is unable to pinpoint the exact date which the damage "commenced," as discussed below there is evidence from which a reasonable juror could conclude that at least some of the damage commenced prior to October 1, 2009—precluding a granting of summary judgment for Defendant.

[20] "We seriously doubt that a person not trained in the law or in the insurance business would construe the language, 'loss or damage commencing ... [d]uring the policy period,' as imposing a manifestation trigger. We will not rewrite this contract of insurance to exclude coverage on the basis of a manifestation theory. Construing the policy as a whole, and being faithful to its language in order to give effect to all of its provisions, we conclude that a real but undiscovered loss or damage, proved in retrospect to have commenced during the policy period, triggers coverage, irrespective of the time the loss or damage became manifest." *Kief*, 534 N.W.2d 28, 36 (N.D. 1995). The Court agrees that the outcome here would be in accordance with the insured's reasonable expectations under the policy.

The Court holds under these circumstances policy coverage is not precluded simply because the damage does not manifest itself or was not discovered until after the policy period expired. *See, e.g., Kief Farmers Cooperative Elevator Company v. Farmland Mutual Ins. Co.*, 534 N.W. 2d 28 (N.D. 1995); *Ellis Court Apartment Limited Partnership v. State Farm Fire and Casualty Co.*, 72 P.3d 1086, 1088 (Wash. App. 2003). Accordingly, Plaintiff's claims will be covered if the damage "commenced" on or before October 1, 2009.

In this case, Plaintiff argues the damage to the operating room floors commenced on or before October 1, 2009. In support of this assertion, Plaintiff relies on the testimony of Terry J. Willems of CTL Group:

> This letter presents CTL Group's opinion as to when the reaction of coal particles started in the concrete slab of Operating Rooms (OR) 4, 7, and 8 where a lead sheet had been installed on top of the concrete. Specifically this letter answers the question: did coal expansion commence by October 1, 2009 in OR's 4, 7, and 8?

(Docket No. 42-1.) Thus, Plaintiff's position appears to be that the damage "commenced" when the coal began to expand. Terry Willems' ultimate conclusion was that the expansion of coal particles in the near-surface region of the concrete in operating rooms four, seven, and eight started before October 1, 2009:

> In summary, CTL Group is prepared to testify that expansion of coal particles in the near-surface region of the concrete in OR rooms 4, 7, and 8 started before October 1, 2009.

(Docket No. 42-1.) Defendant does not actually address the substance of this testimony—that the expansion occurred before October 1, 2009. Instead, Defendant argues that Plaintiff cannot actually show when the loss or damage commenced.

Defendant relies on an evaluation prepared by CTL Group at the request of MCCH on December 14, 2009:

> As long as sufficient moisture is present in the concrete, further expansion of near surface coal particles is expected. The amount and rate of addition bump formation can not be predicted with a reasonable degree of certainty.
>
> * * *
>
> As previously stated, the mechanism of coal expansion is not fully understood. It is not known how much moisture is required for expansion to occur. The amount and rate of additional bump formation can not be predicted with a reasonable degree of certainty.

(Docket No. 40-5, Page 6.) While admittedly there may be some question of the accuracy of the CTL Group finding of when the coal actually began expanding, it is undisputed that there is evidence in the record supporting the assertion that the coal began expanding before October 1, 2009. Defendant has not contested this evidence other than by questioning its accuracy and asserting there is "no way of knowing when the coal started expanding." (Docket No. 46, Page 3.)

There appears to be little dispute that the concrete aggregate caused the damage to the flooring. It was poured during the coverage period and the flooring was installed during the coverage period. Eventually, portions of the floor were damaged by bubbling or dimpling. There appears to be no dispute that this damage was due to the presence of shale/low grade particles at or near the surface of the installed light weight concrete slab floors. When exposed to high moisture levels the particles were prone to swelling.

The parties have different views as to when the damage or loss commenced. They seem to focus on when the coal particles expanded. Defendant seems to say you cannot say with "certainty" when the damage commenced. Plaintiff argues it clearly was within the policy period. One could argue it commenced when concrete was poured or the moment the flooring was installed. Regardless, under any of these commencement possibilities—when the concrete was poured, when the flooring was installed, or when the coal actually began expanding—there is a genuine dispute of material fact which precludes granting of summary judgment to Defendant.[21] The Court will reexamine this issue at the close of the evidence.

II. <u>Plaintiff's Allegation that Pursuant to KRS 304.14-370 the Assurance Suit Limitation Period was Estopped from the Time MCCH First Notified Assurance of its Loss Claim Until the Date Assurance Denied the Claim</u>

MCCH first provided notice to Assurance of its property damage claim on January 7, 2011. On June 1, 2011, Assurance sent a letter to MCCH stating it had retained an engineer to inspect the project and determine the cause of damage, but would conduct the investigation under reservation of rights. On August, 2, 2011, Assurance sent a letter formally denying MCCH's claim. (Docket No. 35, Page 2-3.) Plaintiff asserts that the time to file suit is equitably estopped during the period when the insurer is considering the claim. However, Sixth Circuit precedent holds that such estoppel does not occur.

---

[21] If the commencement date was found to be when the concrete was poured, the damage would clearly be within the coverage period. (*See* Plaintiff's Timeline, Docket No. 40-2.) If the commencement date was found to be when the flooring itself was installed, the commencement date would clearly be within the coverage period. (*See* Plaintiff's Timeline, Docket No. 40-2) (*See* Docket No. 42, Page 5.) If the commencement date was found to be when the coal began to expand, as discussed above there is a genuine dispute of material fact as to whether this expansion occurred within the coverage period.

The Sixth Circuit has previously held that a one-year suit limitation provision in a homeowner's policy was not temporarily estopped from running while an insurer considered whether or not to deny an insured's claim. *Smith v. Allstate Ins. Co.*, 403 F.3d 401, 402-04 (6th Cir. 2005). Plaintiff criticizes the majority opinion in that case and argues the dissent properly recognized the impact KRS § 304.14-370 has on the analysis. KRS § 304.14-370 provides in relevant part that: "No conditions . . . in a contract of insurance shall . . . limit the time for commencing actions against such insurers to a period of less than one (1) year from the time when the cause of action accrued." Plaintiff argues, as the dissent in *Smith* did, that a cause of action does not "accrue" until the insured has the right to institute and maintain a suit, which does not occur until the insurer breaches the contract by wrongfully denying the claim. Thus, Plaintiff argues the insured should always have at least one year from the insurer's denial of the claim to file suit. However, Plaintiff acknowledges

> that this Court may determine that majority opinion in *Smith v. Allstate Ins. Co.* is dispositive on this issue. If so, Wehr contends that the majority opinion in *Smith* was incorrect and makes an equitable tolling and waiver/estoppel argument here to preserve the issue so that, if necessary, it will have the opportunity to argue on appeal that the dissenting opinion was correct and the equitable tolling rule should apply in this case.

(Docket No. 35, Plaintiff's Response, Page 24.) The Court is bound by clear Sixth Circuit precedent, even in the face of sensible arguments to the contrary. Accordingly, the Court holds that pursuant to the Sixth Circuit opinion in *Smith v. Allstate Ins. Co.*, 403 F.3d 401, 402-04 (6th Cir. 2005), the time to file suit is not equitably estopped during the period when the insurer was considering the claim in this case. The Court notes that Plaintiff has preserved this issue for appeal.

CONCLUSION

For these reasons, and consistent with the Court's conclusions above,

IT IS HEREBY ORDERED that Defendant Assurance Company of America's Motion for Summary Judgment is **GRANTED in part** and **DENIED in part**, consistent with the above opinion. It is hereby ordered as follows:

(1) The Court will **GRANT** summary judgment to Defendant as to claims arising from damage to vinyl floors in the patient rooms and hallways because MCCH had knowledge of those claims more than two years before the filing of this Complaint on November 23, 2011.

(2) The Court will **DENY** summary judgment to Defendant as to claims concerning the operating room floors.[22] It will be a jury question whether or not MCCH had knowledge of those claims more than two years before the filing of this Complaint on November 23, 2011. The Court will reexamine this issue at the close of the evidence.

(3) The Court will **DENY** summary judgment to Defendant based on their argument that the damage did not "commence" during the coverage period. The Court will reexamine this issue at the close of the evidence.

(4) The Court **ORDERS** the telephone conference on December 20th cancelled. A telephone conference is set for **December 9th at 10:30 AM central time**. Pretrial filing deadlines are vacated at this time and will be set by the Court at the conference. The Court will place the call.

IT IS SO ORDERED.

Date:

cc: Counsel

---

[22] It also appears that Plaintiff alleges subsequent to the discovery of damage to the operating room floors, "new additional damage in other locations" was discovered. (Docket No. 35, Page 15.) This damage is alleged to involve "other locations, including the hallway adjacent to the Operating Rooms" and not "just over the lead." (Docket No. 35-8.) To the extent damage was discovered subsequent to the manifestation of damage to the operating room flooring and was not "worsening" of damage previously discovered, the Court will deny summary judgment to Defendant on those claims as well.